**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE<br><br>**FRANK J. HEIDENRICH, JR.,**<br><br>Debtor<br>―――――――――――<br>**NICHOLAS J. KAPOLIS and DEMETRA J. KAPOLIS,**<br><br>Plaintiffs<br><br>v.<br><br>**FRANK J. HEIDENRICH, JR.,**<br><br>Defendant | **Chapter 7**<br>**Case No. 09-11188-FJB**<br><br><br><br>**Adversary Proceeding**<br>**No. 09-01195** |

**MEMORANDUM OF DECISION ON**
**COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY**

By their complaint in this adversary proceeding, Nicholas and Demetra Kapolis seek a determination under 11 U.S.C. § 523(a)(2)(A) of the dischargeability of their prepetition judgment against the defendant and debtor, Frank Heidenrich, Jr. (the "Debtor").  They argue that the judgment, which arose from his service as general contractor in the renovation of Nicholas's home, is a debt for a false representation he made in inducing them to enter into a construction contract with him and, in parts, from other misrepresentations he made in the execution of the contract.

**Procedural History**

On February 17, 2009, Frank Heidenrich ("Heidenrich" or "Debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  At the time, he was obligated to Nicholas Kapolis ("Nicholas") and his sister, Demetra Kapolis ("Demetra") (together, "Plaintiffs"

or "the Kapolises") on a judgment they had obtained against him by default in the amount of $169,768.97.  On June 16, 2009, the Kapolises, acting pro se, filed a complaint under 11 U.S.C. § 523(a) challenging the dischargeability of the judgment debt, thereby commencing the present adversary proceeding.  Later, with the assistance of counsel, they filed an amended complaint.  The amended complaint asserts three grounds on which the Kapolises contend their judgment debt, or parts thereof, should be excepted from discharge.[1]

First, they contend that in order to induce them to hire him for their home renovation project, Heidenrich knowingly gave them false references regarding his past contractor jobs.  The references were false, they contend, because the Kapolises had asked for references from jobs on which he had been the general contractor, but some of the references Heidenrich provided were from jobs on which his son had been the general contractor.  The Kapolises further allege that they relied on this misrepresentation to their detriment by entering into the contract with him and suffering numerous adverse consequences from that decision, leading to their judgment against him.  As a result, Plaintiffs assert that the Court should deem the entire judgment debt to be nondischargeable.

Second, the Kapolises allege that during the course of the project, Heidenrich knowingly and fraudulently presented them with false invoices with the intent of inducing them to rely on the invoices.  They state that they justifiably relied on those invoices by making payments on them.  The Kapolises contend that the invoices were false in various ways, but especially by representing that services had been rendered that had not in fact been rendered or that materials had been purchased that had not in fact been purchased.  The Kapolises contend their judgment against the Debtor should be excepted from discharge to the extent of payments made on fraudulently misrepresented items in the invoices.

Lastly, the Kapolises allege that Heidenrich intentionally misrepresented to them that he would file an insurance claim with his own insurance carrier on their behalf for extensive rain

---

[1] The complaint also included other grounds that the Kapolises did not pursue at trial.

2

damage that occurred when he left their roof open in a major storm, that he intended to induce them to rely on this representation, that in justifiable reliance on this misrepresentation, they did not file an insurance claim themselves, and that they suffered damage because, when they learned that he had not in fact made an insurance claim, it was too late to prove and recover most of the damages from their own carrier, the damaged area having by then already been demolished. As a result, the Plaintiffs contend that their claim against him should be deemed nondischargeable to the extent of the rain damage that was not covered by their own insurance.

On August 4, 2010, the Court conducted a trial of the matter at which four witnesses testified and thirteen exhibits were introduced into evidence. On the basis of the evidence adduced and pursuant to FED. R. CIV. P. 52(a)(1), the Court now enters the following findings and conclusions and, for the reasons thus articulated, will enter judgment for the Debtor.

**Facts**

    a.    **Contract Formation**

In 2005, Nicholas and Demetra decided to renovate the home that Nicholas owned, located at 50 Old Stage Road, Centerville, Massachusetts. They were renovating and expanding the home to serve as their home in retirement and planned to fund the project largely with monies left them by their mother. The scope of the project was large; according to Demetra, the renovations would expand the house by three times its original size.

The Kapolises had no experience hiring a general contractor. In furtherance of their renovation project, they first obtained architectural plans from an architectural designer and then solicited bids from a few contractors of whom they had learned either through word of mouth or through signs they had seen at construction sites. They reviewed the architectural plans with five contractors, each of whom later returned with a list of references, an estimate of what work the project would entail, and a bid.

The Kapolises first learned of Heidenrich when Demetra saw a sign for his company, Osterville Builders, on a home construction site. They were interested in hiring a local contractor to perform the work on the Centerville home. When they saw that Heidenrich was based on Cape Cod, they decided to solicit a bid from him.

Heidenrich, who is 61 and now retired, was a carpenter and builder by trade. When he met the Plaintiffs, he had operated a contracting business through his wholly-owned corporation, Osterville Builders, Inc. He testified that he has worked as a general contractor on hundreds of occasions in his career. On a few occasions he has worked for his son, who owns and operates a separate contracting business of his own, on projects for which his son was hired as general contractor. He testified that when he worked for his son, he did not work as a subcontractor—for example, as a carpenter—but assisted his son in performing the general contracting duties.

Demetra called Heidenrich and asked for an estimate on their project. Additionally, she testified, she asked him for references from jobs on which he had been the general contractor. She did not indicate the specific words she used for this request or the manner or circumstances in which she made it; and no other evidence has been adduced on these issues. Therefore, the Court can make no findings as to whether Heidenrich knew or should have understood that she was seeking not just "references," or "references from jobs on which he had worked in any relevant capacity," or "references from jobs on which he had performed general contracting duties," but "references from jobs on which he or Osterville Builders had been the contracting party."

Heidenrich provided Demetra with an estimate and a list of references. The list identified seven references, four homeowners and three businesses, and for each provided a telephone number and a brief description of the work Heidenrich had done or was doing on the reference's project. The last, one of the businesses, was identified as an "upcoming project," indicating that this project had not yet been started. The list did not expressly state or in any way represent

4

that the listed projects were projects on which Debtor had himself been hired as general contractor.[2]

It is undisputed that two of the seven listed references—Christine Cummings and Sarah Champion—were for projects on which the Debtor had himself been hired as general contractor. On each of the others, his son had been the general contractor, and Debtor had worked on the project for his son. Heidenrich testified that his work on these other projects had been in the nature of assistance with the general contracting duties, and I find this testimony credible, as it is corroborated by other evidence in the record.

Demetra spoke with the contractors and followed up on their references. Upon receiving Debtor's list of references, Demetra called the four homeowners listed. Of these, she spoke with only two, Ann Borokov and Dennis Liakos; the other two—those on whose projects Debtor had been hired as general contractor—did not return her calls. Demetra did not attempt to contact that the other three references, all businesses, because, as she testified, she was only interested in home projects—and accordingly I find that she and Nicholas did not rely at all on the business references or on Heidenrich's representation that they were relevant references. Demetra did not ask either of the references with whom she spoke whether Debtor had been the general contractor on their individual jobs, and neither indicated that he had not been general contractor on their jobs. However, one of the references, Mr. Liakos, warned her "to hold back on the money, not to give him much money up front." This warning, coming from one of the references on whose project Heidenrich had *not* been the general contractor, tends to corroborate Debtor's own testimony that his responsibilities on these jobs were in the nature of general contracting responsibilities. He was the party to whom the project owner made payments. In addition, it appears that Demetra was able to have conversations with these two

---

[2] A cover letter that Heidenrich faxed to Demetra with the list referred to the references as "customers": "In the process of updating and speaking to customers to coordinate viewing projects. and their schedules (sic)." This characterization of the references as customers is not indicative of Heidenrich's responsibilities on the jobs in question. He could as easily and innocently have used the term for those project owners for whom he had merely assisted his son as general contractor as for those for whom he was the party with whom they had contracted.

5

references about Heidenrich's qualifications as a general contractor, conversations that would have been meaningless to the references had Heidenrich not been known to them as the contractor on their projects;[3] yet they said nothing to Demetra to this effect, and this too I construe as corroboration that his duties on these jobs had been those of a general contractor.

Demetra spoke with Nicholas about the fact that one of the references had cautioned her to "hold back on the money, not to give him much money up front." They decided that this concern shouldn't dissuade them from hiring him, that they could manage it. Additionally, Demetra made inquiries regarding Heidenrich with the Better Business Bureau and with the Consumer Protection Division of the Attorney General's Office, neither of which reported to her that any complaint had been filed against Heidenrich or Osterville Builders. Satisfied with their discussion with Debtor as to the concerns that the reference raised, Nicholas and Demetra agreed that Nicholas should hire Heidenrich for the project, and he did.

On February 11, 2006, Nicholas and Heidenrich[4] entered into a written agreement for work to be performed on his Centerville home. Nicholas agreed to pay Heidenrich $245,900.00 for the material and labor to be performed under the contract. The contract required payment of seven percent of the contract price upon signing, billing every two weeks "on percent of work completed," and hold-backs of five percent for occupancy permit and another five percent "for punch list and satisfy owner." Demetra was not a party to the contract.

b.     **Invoice Issues**

Both parties testified that approximately every other week during construction, Nicholas and Heidenrich met at the construction site. At each meeting, Heidenrich presented Nicholas with an invoice itemizing charges for work he had performed and for deposits on work to be

---

[3] Heidenrich's son, Justin Kelly, has a different last name from his father, and so it is not possible that Demetra and the references were discussing a Mr. Heidenrich but, unbeknownst to each other, referring to different Heidenriches.
[4] The contract was with "Frank Heidenrich DBA Osterville Builders, Inc.," not with Osterville Builders, Inc.

6

performed or materials to be procured in the future, and, after discussion of the various charges and the progress of the project, Nicholas wrote Heidenrich a check for the invoiced items.

The Kapolises submitted five sets of invoices into evidence at trial. Plaintiffs paid in full for all of the items listed on those invoices. The Kapolises contend that Heidenrich included in the invoices certain items that were false statements, made with knowledge that they were for work that he had not performed or for materials that he had not and did not intend to purchase, and that Heidenrich included these items to induce Nicholas to make payments in excess of amounts then due on the contract, and that Nicholas justifiably relied on these representations to his detriment by paying for the now-disputed items. Heidenrich testified that representations were not false or made with knowledge of falsity and intent to deceive.

The evidence as to each item is scant. The statements themselves are established by the introduction of the invoices, but as to most other elements—falsity, scienter, intent to deceive, reliance—the only evidence is Nicholas's uncorroborated testimony, which in most instances is contradicted by Heidenrich's testimony. Nicholas and Heidenrich discussed many billed items before Nicholas paid them, but no evidence has been adduced as to the substance of these discussions; this is perhaps attributable to a lapse of over four years between the events in question and the date of trial, but whatever the reason, the absence of evidence as to these discussions does not inspire confidence that all the relevant evidence is before me. Moreover, on the issue of reliance, Nicholas's testimony tends to show that there was none. Nicholas concedes that he reviewed the items in each invoice with Heidenrich before making payment and was frequently skeptical of the invoices and the representations they contained but elected to make payment despite his reservations. For these reasons and for those specified below as to each item in issue, the Court concludes that the Kapolises have not carried their burden as to any one of them.

### 1. Window Order

The invoices dated February 25, 2006 included charges of $9,750.00 for "deposit on custom window order" and $2,200.00 for "additional cost of window grills." This was a charge for a deposit to purchase the window, not a charge for payment of a window received or installed. At trial the Kapolises testified that Heidenrich never purchased the correct windows listed on the February 25, 2006 invoice. Still, there was evidence that Heidenrich had purchased windows for which this charge was to serve as a deposit, but also that he had mistakenly purchased windows that did not conform to the contract specifications. The evidence is insufficient to find that his inclusion of this item in the invoice was an attempt to bill for material that Heidenrich did not intend to purchase. Rather, it appears more likely to be an honest billing for an intended purchase, followed by a mistake in the execution. This is not fraud.

### 2. Retaining Wall

The invoices dated March 10, 2006 included a charge of $750.00 for "excavation, labor, concrete pour retaining wall." The evidence shows that this charge was for the excavation, labor, and concrete pouring involved in creating a retaining wall. Nicholas testified, and I find, that although a retaining wall was constructed on the site, no concrete foundation was ever poured for the wall. It is unclear whether the construction of the wall involved a "concrete pour" other than for the foundation—no details whatsoever are in evidence. Nicholas concedes that a wall was constructed. On the evidence presented, I cannot find that the evidence of fraud amounts to a preponderance. At best, the evidence suggests a failure to adhere to contract specifications or construction standards—though no evidence of specifications or standards was introduced—but these alone are not enough to establish intent to defraud.

### 3. Foundation Windows

The invoices dated March 10, 2006 included an "extra work" charge of $170.00 for "windows in foundation wall, materials only," and the invoices dated March 24, 2006 included a further charge of $690.00 for "windows in foundation wall, material and labor." The evidence shows that Heidenrich framed openings in the foundation wall to receive the windows but never installed windows in the openings. Nicholas conceded that he did not know whether Heidenrich had ever purchased the windows. From this evidence the plaintiffs urge the court to conclude that Heidenrich never purchased or installed the windows and that he billed for the windows and labor with knowledge that the invoices were false as to these items and with intent to deceive and induce reliance. At trial Heidenrich had no answer to this charge. To be fair, however, he also had no advance knowledge of it, as the Kapolises neither pleaded this particular charge of fraud in the complaint with particularity nor even identified it in their pretrial memorandum,[5] and the events at issue had occurred over four years before the trial. The Kapolises presented no evidence as to their reliance on these charges, at least the latter of the two. The installation of the windows would have been easy for Nicholas to verify; he was at the job site when presented with this bill, and his purpose in being there was to review both the progress of work on the project and the charges being presented for payment invoices. The absence of windows in the framed openings would have been evident. Lacking evidence that Nicholas did not actually check this item but instead relied purely on Heidenrich's representation in the invoice that they had been completed, the Court cannot find that he relied on the representation at all. I am not finding here that there was reliance that was not justifiable; rather, I am finding that the preponderance of the evidence tends to show no reliance at all. The fact that the noncompletion of this item would have been evident also tends to establish that Heidenrich did not make it with intent to deceive: he could not have expected to be successful in the

---

[5] The same is true as to each of the invoice items now in controversy: the Kapolises neither pleaded these particulars in the complaint nor identified them in their pretrial memorandum. They merely made a general charge of fraud through unspecified invoice items.

9

deception. For these reasons, I conclude that the Kapolises have not carried their burden of proof as to either reliance or intent to deceive.

### 4.    Management Charge

The invoices dated March 10, 2006 also included a $2,000.00 charge for "labor for week management." The Kapolises testified that Debtor had not been present at the job site enough to justify this management fee. The evidence shows that the Kapolises were aware when Nicholas paid for this item that Heidenrich had not been present on the job site to the extent necessary to justify this charge. I find that insofar as this charge may constitute a misrepresentation, it is not one by which Nicholas was deceived or on which he relied. He made the payment with knowledge of the alleged falsity of the representation.

### 5.    The May 6 Charges

The invoices dated May 6, 2006 included the following items, all characterized on the invoice as "extra work": a $10,000 charge for "deposit on plumbing, heat, electric, roof and siding," an $800 charge for "front wall demo, frame, remove electrical, retaining wall on side of driveway," a $3,400 charge for "retaining wall on side of driveway," and a $685 charge for "install new structural header front wall." Nicholas testified that the plumbing and electric were never installed, that only part of the roofing and siding work was completed, and that the retaining wall inside the driveway was never finished. In addition, Nicholas testified that the extra work billings were for work that was already included in billings for regular work. On the basis of this evidence, the Kapolises would have the court conclude that the items were included on the invoice without intent to complete the work and with intent to deceive and induce reliance.

With respect to the $10,000 deposit, I find on the basis of Nicholas's own testimony that the work in question was commenced and partly completed. Also, not long after the date of this

10

invoice, Heidenrich was diagnosed with cancer (as explained below) and hospitalized, which explains his failure to complete this project and may well account for his failure to complete the work for which this deposit was billed and paid. Therefore, I conclude that the billing for the $10,000 deposit was not essentially a false representation as to intent to perform work. With respect to the contention that the characterization of this work as "extra" was a fraudulent attempt to double-bill for work that was part of the basic contract, I find the contention unproven, the Kapolises having failed to show that these items had been previously billed and paid.

### 6. Framing Labor

The invoices dated March 24, 2006 included a charge of $12,000 for "deposit on framing labor and demo for week." The invoices dated April 7, 2006 included a further charge of $12,000 for "framing labor for past 2 weeks." The Kapolises contend that the April 7 charge was a double-billing for the $12,000 that had already been billed as a deposit in the March 24 invoice. Heidenrich testified that these two billings were proper charges for four weeks of labor and that the billing dates listed on the invoices did not necessarily coincide with the actual dates of the framing work. Aside from the text of the invoices themselves, Plaintiffs presented no evidence as to these charges. Notably missing is any evidence as to the amount of framing labor that was performed on the project during the period in question. It is plausible—at least as plausible as the Kapolises' proposed explanation—that the cost of framing labor was $24,000, half of which was paid at or near the beginning of the framing work and half of which was paid after completion. With respect to this representation, the Kapolises have not carried their burden of proof as to falsity.

### c. Insurance Coverage

During construction, when the roof over the original structure had been temporarily removed, a heavy rain caused damage to Nicholas's home because Heidenrich's attempts to

11

cover the opened roof with tarpaulins proved inadequate.  What happened next is in dispute.  The Kapolises testified that at some point—they do not specify when—Heidenrich told them that he would file a claim for insurance coverage with his insurance carrier, and that the Kapolises would be compensated by that means.  Heidenrich responds that he made no such promise until much later.  He testified that he and the Kapolises initially reached an agreement that he was going to pay the damage himself because it was so minor.  He added that he was never able to follow through on this promise because he became ill.  Heidenrich further testified that much later, during litigation in the District Court (no date or period is specified, but, as discussed below, that the parties were litigating in the District Court in 2008), the Kapolises' attorney asked him to file a claim against his policy.  He remembered that he obtained the paperwork to file a claim but never filed it; he could not remember whether he promised the Kapolises that he would file one.

The Kapolises testified to a quite different version of events. They testified that the damage was not minor but extensive:  it required replacement of walls, floors, insulation, and electrical work throughout the original structure, down to the basement, and cost approximately $110,000 to repair.  They further testified that Heidenrich did not tell them that he himself would pay for it. Rather, they testified, he told them that he would file an insurance claim:  "Don't worry about anything, my insurance company will take care of it," he allegedly told them.  They do not indicate when he made this representation.  Months later (again they specified no date) they learned that in fact he never had filed a claim.  At this point they filed a claim under their own policy and received partial reimbursement for the damage, approximately $53,000.  Nicholas testified that this was inadequate to repair the damage, as he had to pay another $60,000 or $70,000 to complete repairs to the damaged areas. Demetra testified that she believed the $53,000 paid by their insurance company was much less than they would have received had they filed their claim sooner because, by the time they filed their own claim, Heidenrich had

12

already demolished most of the damaged materials and structure, with the result that their insurer could not see and verify the full extent of the damage.

Still, the Kapolises adduced no evidence as to the extent of coverage that would have been available from their own carrier had they filed their claim when Heidenrich allegedly promised to file a claim of his own. They adduced no evidence as to the extent of coverage that would have been available from Heidenrich's carrier had he filed a claim when he allegedly promised to. They adduced no evidence—other than Nicholas's conclusory testimony of $60,000 or $70,000—as to the extent of damage suffered beyond that which was reimbursed.[6]

The Court concludes that the Kapolises have not carried their burden of proof as to this count. The evidence they have adduced in support of this count consists almost entirely of their self-serving testimony, is wholly lacking in corroboration, and is contradicted by Heidenrich's own testimony. There is no evidence as to crucial dates and matters of timing. They offered no testimony as to whether it was justifiable to rely on Heidenrich's representation at all; they offered no explanation as to why they did not immediately file a claim of their own, regardless of whether Heidenrich also filed one. Most importantly, they adduced no evidence suggesting that, if and when Heidenrich represented to them that he would file an insurance claim for their benefit, he had no such intent and made his misrepresentation with intent to deceive them and induce reliance thereon. Specific intent is rarely demonstrable by direct evidence, and I would not expect any here, but here there is no suggestion that Heidenrich was motivated by a desire to avert the Kapolises' filing a claim of their own.

### d. Discontinuance of Work; The State Court Litigation

On or about May 19, 2006, about three months after entering into the agreement and well into the construction project, Heidenrich was diagnosed with multiple myeloma, a form of

---

[6] Nicholas's attorney asked him,"How much additional work was required to restore it?" He responded: "Probably another sixty on top of that, seventy, around that whole area." This is the full extent of evidence on the issue.

13

cancer. Around the same time, he checked into a hospital and, as a result of his cancer, hospitalization, and treatment, ceased working on the Kapolis project, leaving it far from complete. With work at a virtual standstill, Nicholas hired Mr. John Keefe, the framing subcontractor whom Heidenrich had hired for this project, to "close in" the home and protect it from the elements. Thereafter, Nicholas "shut the whole job down," terminated Heidenrich's service, and eventually completed the project through other contractors. Heidenrich was never again well enough to return to the project.

Frustrated first with Heidenrich's performance before his illness and then with the cessation of work, Nicholas and Demetra filed a six-count complaint against Heidenrich in Barnstable Superior Court on October 16, 2006. The complaint itself was not entered into evidence. Testimony of Demetra suggests that the counts listed in the complaint included breach of contract, false pretenses, fraud, and violations of 93A, but the court has no evidence as to the specifics of each count. Heidenrich was duly served but did not defend. As a result, the Kapolises moved for default judgment, whereupon the Superior Court conducted proceedings to assess damages. The nature and details of these proceedings are not in evidence. The Superior Court assessed damages on Count I (the nature of which is not specified) in the amount of $169,768.97, and the sum of $1.00 as to each of the five other counts (whose natures, too, are unspecified). Accordingly, on October 4th, 2007, the Superior Court entered judgment by default against Heidenrich in the amount of $169,768.97, plus prejudgment interest of $19,702.97 and costs of $296.25. Lacking evidence as to the content of the complaint and of the proceedings for assessment of damages, the Court cannot determine what the awarded damages are compensation for.

In subsequent proceedings in Barnstable District Court for enforcement of the judgment, Heidenrich appeared and agreed to entry of an order, entered November 17, 2008, requiring that he pay the Kapolises $1,000 per month on their judgment. He made one or two such payments, then filed his bankruptcy petition. At present, he continues to be treated for cancer

14

and is unable to work. His only income is Social Security disability income, and he has no means of paying the judgment.

**Discussion**

Among the debts excepted from discharge in 11 U.S.C. § 523(a) is any debt "for money, property, services . . . to the extent obtained, by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). As with all § 523(a) exceptions to discharge, the exception listed in § 523(a)(2)(A) is "narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour Real Estate v. Menna*, 16 F.3d 7, 9 (1st Cir. 1994)) (internal quotation marks omitted). As creditors invoking 11 U.S.C. § 523(a)(2)(A), the Kapolises must prove each element of the exception by a preponderance of the evidence. *Palmacci*, 212 F.3d at 787 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1995)). Specifically, the Kapolises must show by a preponderance as to each count asserted that: (1) the debtor made a false representation; (2) he did so knowingly or with reckless disregard of the truth; (3) he made the misrepresentation with intent to deceive them and to induce them to rely upon it; (4) they did rely upon it; (5) their reliance was justifiable; and (6) their reliance caused pecuniary loss. *Palmacci*, 121 F.3d at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or justifiability of reliance).

    a.    **The List of References**

As their first basis for nondischargeability under § 523(a)(2)(A), the only one of their bases that goes to the entire judgment debt, the Kapolises contend that Heidenrich knowingly misrepresented to them that the references he provided them were for jobs on which he had been the general contractor, meaning the party with whom the homeowner had contracted,

when in fact this was true of only two of the seven references.  The Court finds that the Kapolises have not carried their burden on this count for the following reasons.

First, they have not adduced sufficient evidence of precisely what Demetra asked Heidenrich to produce and precisely how she asked for it.  The alleged misrepresentation here is not an express statement by the defendant; rather, it is the implicit statement that the references he produced conformed to what Demetra had requested.  Lacking the details of this request, the Court cannot conclude by a preponderance of the evidence that what he produced did not conform to what she requested—that is, that it was false—or that Heidenrich knew it to be false or that he made the representation with intent to deceive.  As to each of these elements, it is necessary to know precisely how Demetra made her request.

Second, the evidence shows that as to each of the four homeowner references he provided, Heidenrich did perform the general contracting duties on the project.  It is true that he was not the contracting party on all four, but especially where Demetra's request is unclear, the Court can find no certain or self-evident falsehood in his response.

Third, the evidence does not preponderate in favor of a finding that the Kapolises relied on this representation.  What they contend is that it was important to them that he had served as general contractor on at least the four homeowner projects for which he had supplied references, and that they would not have hired him had they known he had only been general contractor on two of these.  Had they been interested in the extent of his experience as a general contractor, they would have asked him directly how many home projects he had handled, and it is unlikely that a mere four jobs would have sufficed, especially if two would not have.  In addition, they did not bother to contact more than two, did not ask him to supply further references when two did not return their inquiries, did not inquire of the two with whom they did speak as to the capacity in which he had worked on their projects, and hired Kapolis notwithstanding a caution from one.

And fourth, as to Demetra, reliance cannot be shown for the further reasons that she was not a party to the contract, did not hire Heidenrich, and did not own the home on which he worked. In her dealings with him, she acted essentially as agent for Nicholas, not in any capacity of her own.

Accordingly, the Court concludes that the Kapolises have failed to discharge their burden of proof as to the necessary elements of this count under § 523(a)(2)(A).

### b.    The Invoices

The alleged misrepresentations in the invoices fall into two categories: representations as to past facts—that work was performed or materials purchased; and representations as to intent—that a deposit was necessary because Heidenrich intended to use it to purchase materials or complete specified parts of the project. Representations as to intent to perform can be cause to except a resulting debt from discharge. As the First Circuit Court of Appeals has explained, "[i]f, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent)." *Palmacci*, 121 F.3d 781, at 787 (1st Cir. 1987) (citations omitted). Still, as to each misrepresentation, whether as to past performance or as to intent to perform in the future, the plaintiffs must satisfy each of the requirements enumerated above in order to prevail under § 523(a)(2)(A). For the reasons articulated in the findings of fact above, the plaintiffs have not carried their burden of proof as to any one of the items in question, and judgment must accordingly enter for Heidenrich as to the invoice counts.

### c.    The Insurance Claim

The Kapolises allege that Heidenrich intentionally misrepresented to them that he would file an insurance claim with his own insurance carrier for the rain damage to Nicholas's home, that he intended to induce them to rely on this representation, that in justifiable reliance on this

17

misrepresentation they did not immediately file an insurance claim themselves, and that they suffered damage because, when they learned that he had not in fact made an insurance claim, it was too late to prove and recover most of the damages from their own carrier. As detailed above, the evidence in support of this count, as to all its elements but one, is at best sketchy, based on self-serving testimony of one or both of the plaintiffs but controverted by Heidenrich and lacking corroboration. As to the element of intent to deceive and induce reliance, however, I find that evidence is wholly lacking. Therefore, I conclude that the Kapolises cannot prevail on this count.[7]

**Conclusion**

On the basis of the foregoing considerations, the Court concludes that no portion of Heidenrich's judgment debt to the Kapolises is excepted from discharge. A separate judgment will enter accordingly.

Date: December 20, 2010

Frank J. Bailey
United States Bankruptcy Judge

---

[7] Accordingly, I need not determine whether the evidence suffices as to any other element of this count.